## SCHOOLFIELD v. BARNES et al.

Western Section. May 18, 1934.

Petition for Certiorari denied by Supreme Court, October 13, 1934.

Solon L. Robinson, of Pikeville, T. W. Stanfield, of Chattanooga, and W. C. Haggard, of Dayton, for complainant.

J. G. Stephenson, of Nashville, for defendants Tennessee Hermitage Natl. Bank and Commerce Union Bank of Nashville.

KETCHUM, J. The controversy in this case is over two notes executed by Dr. Isaac Barnes and wife, Maude E. Barnes, one for $2,000, and the other for $570, and payable to the order of R. B. Schoolfield and S. H. Blackburn. Blackburn was president of the Bledsoe County Bank & Trust Company; and these two notes were held by him in trust to collect and apply the proceeds toward the payment of two notes which he and Schoolfield owed, one for $877.23 in favor of the Bledsoe County Bank, and the other for $2,000 held by H. P. Payne. The bona fides of this trust agreement does not seem to be questioned in this suit. But, notwithstanding this trust agreement, Blackburn, who had become financially involved, indorsed said Barnes notes without the knowledge or consent of Schoolfield, by writing Schoolfield's name and his own name on the back thereof, and transferred them for value and before maturity to the Bledsoe County Bank & Trust Company; and that bank in turn transferred them for value and before maturity to the Tennessee Hermitage National Bank of Nashville.

The bill charges that Blackburn had forged complainant's name in

the indorsement on the notes, and that he had fraudulently and in violation of his trust agreement transferred the Barnes notes to the Bledsoe County Bank & Trust Company on account of his private indebtedness; and that that bank had transferred them to the Tennessee Hermitage National Bank of Nashville; and it was alleged that the Tennessee Hermitage National Bank was a holder in due course of the $877.23 note on which complainant was a joint maker for the accommodation of Blackburn.

Some time after this, but before the filing of the bill, there was a run on the Tennessee Hermitage National Bank, and in order to prevent a forced liquidation it pledged and transferred all its assets to the Commerce Union Bank of Nashville.

Barnes and wife, Blackburn, and Robertson, receiver for the Bledsoe County Bank & Trust Company, failed to answer the bill, and decrees pro confesso were entered against them.

The Nashville banks filed their joint answer and cross-bill against Schoolfield, Blackburn, and Barnes and wife, in which they alleged that Schoolfield and Blackburn were partners, and that Blackburn was authorized to indorse Schoolfield's name on the Barnes notes; that Schoolfield had knowledge of the transfer; that the Tennessee Hermitage National Bank had acquired them in due course; and that the Commerce Union Bank was then a holder in due course. It was also alleged that Schoolfield was estopped to question the validity of the transfer by reason of the fact that he had accepted the benefits of a trust deed executed by Blackburn to W. T. Bitzer, trustee on February 20, 1931, to secure him and other creditors. In their cross-bill they prayed for a judgment on the notes against Barnes and wife and Schoolfield and Blackburn, and for a sale of the property in satisfaction of the vendor's lien. They also asked for a decree against Schoolfield and Blackburn on the $877.23 note.

Blackburn and Schoolfield filed separate sworn answers to these cross-bills. Blackburn admitted that he had indorsed Schoolfield's name on the Barnes notes without authority, and that the notes were left with him in trust to collect and apply the proceeds on the Payne note and the $877.23 note. Schoolfield renewed the allegations made in the bill with reference to the unauthorized indorsement and transfer of said notes, and the trust agreement, denied that he and Blackburn were partners, and denied that he had any knowledge of the trust deed executed by Blackburn, or that he had or would receive any benefit therefrom, and alleged that said trust deed was executed at the instance of the liquidating agent of the Bledsoe County Bank & Trust Company and for the benefit of the defendant banks and all other creditors of Blackburn.

The chancellor found the facts to be as alleged in the bill, viz.: That Schoolfield and Blackburn were not partners; that Blackburn had no authority to indorse Schoolfield's name on the notes and that

the indorsements were forgeries; that Blackburn held the notes under a trust agreement to collect them and apply the proceeds toward the payment of the Payne note and the $877.23 note; that Schoolfield had no knowledge of the transfer of the notes until after they had passed into the hands of the Tennessee Hermitage National Bank; and that Schoolfield had been compelled to pay the Payne note; and decreed that the defendant banks acquired no title to the Barnes notes, and that they were not holders thereof in due course; and gave judgment thereon in favor of complainant against Barnes and wife, and ordered a sale of the property in foreclosure of the vendor's lien; entered a decree in favor of the banks on their cross-bill against Schoolfield and Blackburn on the $877.23 note after allowing as a credit thereon the sum of $350 collected by the banks on the Barnes notes.

From this decree the banks have appealed to this court and assign errors.

By their assignments of error they complain of the action of the chancellor in the following respects:

(1) In finding as a fact that complainant was an accommodation indorser (joint maker) for Blackburn on the $877.23 note and the Payne $2,000 note;

(2) In finding that while Blackburn held the Barnes notes in trust for the purposes stated, Blackburn fraudulently transferred said notes to the Bledsoe County Bank & Trust Company to pay his individual debt without Schoolfield's knowledge;

(3) In finding that the transfer of the Barnes notes was fraudulent as against Schoolfield, and in decreeing that Schoolfield was entitled to recover said notes from the banks;

(4) In finding and decreeing that Schoolfield was entitled to have the proceeds of the Barnes notes applied to the payment of the Payne $2,000 note and the $877.23 note;

(5) In finding and decreeing that Schoolfield was entitled to have the $350 collected by the banks on the Barnes notes credited on the $877.23 note held by the banks; and especially since these banks collected only $250 on the Barnes notes, $100 having been collected by the liquidating agent of the Bledsoe County Bank & Trust Company on February 5, 1931;

(6) In decreeing that the complainant was not estopped to deny the validity of the Blackburn indorsement on the notes by reason of having accepted the benefits of the Blackburn trust deed of February 20, 1931;

(7) In not decreeing that the acceptance of the benefits of this trust deed was a ratification of Blackburn's indorsement on said notes;

(8) In failing to find and decree that Blackburn's genuine indorsement on said notes, and his transfer thereof to the banks, was a good

and valid equitable assignment of his one-half interest in the notes; and,

(9) In failing to find that the banks were entitled to retain one-half of the $250 collected by them on the Barnes notes, since they at least had a half interest in the Barnes notes.

■ Referring generally to these assignments, we think the proof warrants the findings of the chancellor on the facts complained of in the first seven assignments. It is true that Bitzer, the liquidating agent of the Bledsoe County Bank & Trust Company, collected $100 on the Barnes notes on February 5, 1931; but this was long after said notes had been transferred to the Nashville banks, and the collection was made for their benefit. The banks are therefore chargeable with having collected $350 on the notes instead of $250 as claimed.

■ With reference to the estoppel relied on in the sixth and seventh assignments, the proof shows that Schoolfield had no knowledge whatever of the execution of the Blackburn trust deed; the execution of the trust deed was procured by Bitzer for the benefit of the banks. After the trust deed was prepared, Blackburn, recognizing his obligation to Schoolfield, inserted the description of these notes in the trust deed. The trust deed secured all of Blackburn's creditors and the chancellor regarded it as a general assignment. Under these circumstances, Schoolfield is not estopped to set up Blackburn's fraud in the indorsement and transfer of the notes in violation of the trust agreement.

The first seven assignments will therefore be overruled.

We think there is merit in the eighth and ninth assignments.

■ Under section 7347 of the Code (section 23, N. I. L.), and under the facts as found, it is clear that the banks did not acquire any title to Schoolfield's half interest in the notes under the forged indorsements. The Code provision is as follows:

"When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

It is contended, however, that the indorsement and transfer of the notes to the banks was, at least, effective as a valid equitable assignment of Blackburn's undivided one-half interest therein. On this question the following sections of the Negotiable Instruments Law are pertinent:

Code, section 7365 (section 41, N. I. L.), which provides that where an instrument is payable to two or more payees or indorsees who are not partners, all must indorse, unless the one indorsing has authority to indorse for the others.

Code, section 7373 (section 49, N. I. L.), which is as follows:

"Where the holder of an instrument payable to his order transfers it for value without indorsing it, the transfer vests in the transferee such title as the transferor had therein, and the transferee acquires, in addition, the right to have the indorsement of the transferor. But for the purpose of determining whether the transferee is a holder in due course, the negotiation takes effect as of the time when the indorsement is actually·made."

■ These sections of the Code are in that article of the Negotiable Instruments Law which deals with the negotiation of commercial paper; and under section 7365 (section 41, N. I. L.), the negotiability of the paper was destroyed when it was transferred without Schoolfield's indorsement, so that the banks cannot be holders in due course, notwithstanding the fact that they acquired same in good faith, for value, before maturity, and without any knowledge of the forged indorsement.

■ But it is insisted that the indorsement and transfer of the notes was effective, at least, as a valid, equitable assignment of Blackburn's undivided one-half interest therein. We think this contention is sound; although the paper was not negotiable for lack of the genuine indorsement of both the payees, it was still assignable as a nonnegotiable chose in action, and Blackburn could make a valid equitable assignment of such interest as he had therein.

In Edgar v. Haines, 109 Ohio St. 159, 141 N. E. 837, 838, 38 A. L. R. 795, it was held that an assignment by one of two payees who were not partners, of his half interest, in a note, to a third party, destroyed the negotiable character of the paper, and·rendered it merely a nonnegotiable chose in action. In that case the paper was rendered nonnegotiable by virtue of the fact that the assignment was of only an undivided interest in the note, under the provisions of section 32 of the Negotiable Instruments Law, carried into our Code at section 7356, which provides:

"The indorsement must be an indorsement of the entire instrument. An indorsement which purports to transfer to the indorsee a part only of the amount payable . . . does not operate as a negotiation of the instrument."

After stating that the transfer of the instrument in this manner, being in contravention of the plain provisions of the above ·section, stripped it of some of the qualities of a negotiable instrument, and left it a nonnegotiable chose in action, the court say:

"It does not follow, however, that the transfer of only a part of the amount payable is a void act, or that the transferee acquires nothing by the transaction. It cannot be doubted that any legislative attempt to deny the right of a holder of a part interest in a negotiable instrument to.sell and transfer such interest would be unconstitutional."

In that case, Edgar transferred his half interest in the note to one Mayer, who obtained it by fraud, so that Edgar received no consideration for his interest. Mayer sold it to Kaufman, and Kaufman sold it to the Sixth Avenue Real Estate Security Company, both of whom were purchasers in good faith and for value, and without any knowledge of the fraud perpetrated by Mayer upon Edgar. After reaching the conclusion that the Real Estate Security Company was not a holder in due course, the court proceeded to determine the respective rights of Edgar and the Security Company. The maker of the note did not deny liability thereon, but paid the amount thereof into court, and the litigation was thereafter over the fund.

It was held that Edgar might have recovered as against Mayer or anyone who purchased from him with knowledge of the fraud; but that he could not recover against the Real Estate Security Company, an innocent purchaser, because he had clothed Mayer with apparent indicia of title, with power to dispose of same to an innocent purchaser for a valuable consideration; and he was therefore, by well-settled principles of equity, estopped to deny that Mayer did not have a good title; and it was said that the case was governed by the equitable maxim that where one of two innocent persons must sustain a loss from the fraud of a third, such loss must fall upon that one, if either, whose act made it possible for such fraud to be committed.

This principle is applicable here. Schoolfield left the notes in the hands of Blackburn, impressed with a trust, it is true; Blackburn, in violation of his trust, made a valid equitable assignment of his half interest in the notes to the Nashville banks; and while the banks did not become holders in due course, they were innocent purchasers of an assignable chose in action; and as between Schoolfield and the banks, it was Schoolfield who, by leaving the notes in the hands of Blackburn, made it possible for him to transfer them to an innocent purchaser, and he must therefore bear the loss.

It follows that the Tennessee Hermitage National Bank and Commerce Union Bank are entitled to share equally with Schoolfield the proceeds of the Barnes notes; that is to say, the banks will be entitled to half of the amount due on the notes with interest, and Schoolfield will be entitled to the other half. The banks will be entitled to retain one half of the $350 collected on the Barnes notes, and will apply the other half thereof, as of the dates paid, on the $877.23 note executed by Schoolfield and Blackburn.

The banks are entitled to a judgment against Schoolfield and Blackburn, on the $877.23 note less this credit of $175.

The eighth and ninth assignments of error will be sustained, and the decree of the chancellor will be modified as indicated herein, and as so modified, will be affirmed. The cause will be remanded to the chancery court for such further proceedings as may be necessary.

340

The costs of the appeal will be taxed one-half against the Nashville banks and the surety on their appeal bond, and one-half against Schoolfield and the sureties on his cost bond.

Senter and Anderson, JJ., concur.